UNITED STATES of America,
Plaintiff–Appellee,

v.

Chake G. KOJAYAN, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Hratch Meguerdity KALFAYAN,
Defendant–Appellant.

Nos. 91–50875, 91–50876.

United States Court of Appeals,
Ninth Circuit.

Argued Nov. 5, 1992.

Submitted Dec. 7, 1992.

Opinion Aug. 4, 1993.

Amended Opinion Nov. 1, 1993.

Ronald J. Nessim, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, CA, for defendant-appellant Chake Kojayan.

Robert G. Berke and James L. Rosenberg, Los Angeles, CA, for defendant-appellant Hratch Kalfayan.

Lourdes G. Baird, U.S. Atty., Robert L. Brosio, Chief of the Crim. Div., and Jeffrey S. Sinek, Asst. U.S. Atty., Los Angeles, CA, for U.S. (original briefs).

Terree A. Bowers, U.S. Atty., Robert L. Brosio, Chief of the Crim. Div., Miriam A. Krinsky, Chief of Crim. Appeals, Jeffrey S. Sinek, Asst. U.S. Atty., and George S. Cardona, Asst. U.S. Atty. in the Appellate Section, Los Angeles, CA, for U.S. (supplemental brief).

Before: BEEZER, KOZINSKI and KLEINFELD, Circuit Judges.

**KOZINSKI, Circuit Judge:**

In many ways this is a run-of-the-mill case. A misdeed was committed, and the wrongdoers did their best to keep from being found out. When their actions were questioned, they denied any impropriety and pointed the finger at others. Eventually forced to own up, they did so only partially and grudgingly, "minimiz[ing their] involvement in the ... conduct and ... not fully accept[ing] responsibility." *United States v. Yanez*, 985 F.2d 371, 376 (7th Cir.1993).

A run-of-the-mill case in many ways, but with a twist.

**I**

Chake Kojayan, a middle-aged Lebanese woman, came to Los Angeles from Lebanon on June 13, 1991, with $100,000 worth of heroin sewn into a bag. There's no dispute about that, or about a lot of other things. She had been given the bag by an acquaintance of Hagop Kalfayan (codefendant Hratch Kalfayan's brother) and told to stay at the house of Kalfayan's mother while in Los Angeles. In the meantime, Krikor Nourian was arranging a sale of the heroin to people who turned out to be DEA agents. On June 26, Hratch Kalfayan drove Kojayan to the Airport Hilton Hotel, where they met Nourian and DEA Special Agent Alleva, who was posing as a buyer. After a conversation, part in English and part in Armenian—a language Agent Alleva didn't understand—Kalfayan gave the bag to Alleva. Kalfayan, Kojayan and Nourian were then arrested. Kalfayan and Kojayan were indicted for conspiracy to possess heroin with intent to distribute, 21 U.S.C. § 846, and possession with intent to distribute, 21 U.S.C. § 841(a)(1). Nourian was whisked away by the government, never to be seen again by Kalfayan and Kojayan.

The dispute at trial was about knowledge. Kojayan admitted she was given the bag for safekeeping, but claimed she had no idea what was in it; it was Kalfayan who was in on the deal. Kalfayan claimed the opposite: He was just chauffeuring Kojayan to where she wanted to go; the seemingly incriminating things he said at the hotel were only his translations of Kojayan's statements. The

government claimed both defendants knew what was going on. It went about proving this largely through Agent Alleva, who testified about what Nourian and to some extent Kalfayan told him just before the arrest.[1]

Quite obviously, Nourian was at the heart of this affair. He set up the sale; he knew the two defendants. More importantly, he spoke both English and Armenian, and so could testify directly about what Kalfayan and Kojayan said in Armenian. Agent Alleva, on the other hand, spoke only English, and so could only testify about what Nourian told him was said. Nourian might also have been able to clarify who, if either, of the two defendants was telling the truth: Was it Kojayan (they told me to go for a ride and bring the bag) or Kalfayan (my mother told me to drive her friend to a meeting)? But Nourian didn't appear at trial. Instead, the government introduced his statements (both taped and untaped) under Fed.R.Evid. 801(d)(2)(E), as the statements of a co-conspirator.

Long before the start of the trial, the defendants had tried hard—citing, among other things, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)—to learn Nourian's whereabouts and whether he'd agreed to cooperate with the government. CR 18 at 9, 14. The government responded brusquely: "There is no discovery obligation for the government to inform defendant whether or not her unindicted co-conspirator is cooperating with the government subsequent to his arrest in this case. The government has complied with its discovery obligations; it is not required to be defendant's investigator." CR 23 at 3–4. The district court ultimately ordered the government to give defendants the name and telephone number of Nourian's lawyer. This proved of little help, however, because Nourian's counsel told the defense lawyers that Nourian, if called by the defense, would assert his Fifth Amendment privilege against self-incrimination. Nourian's lawyer refused

to say whether Nourian had an agreement with the government.

■ Nevertheless, the defense attorneys—experienced criminal lawyers—had a strong hunch Nourian must have cut a deal pursuant to which he promised to testify if the government called him. At trial, they decided to make hay out of the government's failure to do so: They argued that, because the prosecution (and only the prosecution) could have called Nourian to the stand but didn't, the jurors should infer that his testimony would have undercut the government's case.[2] This wouldn't have been a remarkably strong inference, but it would have been a permissible one: When the government can call a key percipient witness, but relies instead on out-of-court statements and on testimony by an agent who didn't understand half the critical conversation, a jury could conclude that the witness's "testimony, if produced, would [have been] unfavorable" to the prosecution. *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *see also United States v. Anders,* 602 F.2d 823, 825 (8th Cir.1979).

Unfortunately for the defendants, they had no proof that Nourian was actually available to the government. Thwarted in their attempt to obtain this information under *Brady,* defense counsel were in the unenviable position of having to raise the point without any support in the record. Though they urged the jury to infer the existence of a deal from the circumstances, without any direct evidence of an agreement, their claims naturally seemed weak. As the Assistant United States Attorney forcefully argued to the jury, the defense's contentions appeared to be

a classic example of asking the jury to speculate.... The government can't force someone to talk. They have to agree to talk after they've been arrested.

Well, you can figure out defendant Nourian was arrested. He has Fifth Amendment rights. *He has the right to remain silent.* The government can't force anyone to talk. It is against their Fifth Amend-

---

1. The crucial conversation just prior to the arrest was not recorded, as Agent Alleva explained, for security reasons. RT 10/3/91 at 67.

2. The defense also wanted a so-called "missing witness" instruction, which would have told the jurors that they could, if they chose, draw such

an inference. The district court has discretion to give such an instruction, *United States v. Bautista,* 509 F.2d 675, 678 (9th Cir.1975), or to leave the point to be argued by counsel, Manual of Model Criminal Jury Instructions for the Ninth Circuit, No. 4.15 (1992). The district court did not give the instruction.

ment rights. *Don't be misled that the government could have called Nourian.* RT 10/4/91 at 311 (emphasis added). If the AUSA was telling the truth, the jury would have had no basis for inferring what the defense wanted them to infer. And apparently it didn't: After two days of deliberation, it convicted both defendants on all counts.

## II

■ The AUSA, however, was not telling the truth. Defense counsel had guessed right—Nourian had entered into a cooperation agreement with the government and had promised to "truthfully testify . . . at any trial or other court proceeding with respect to any matters about which [the government] may request his testimony." Cooperation Agreement at 2.[3] Even if Nourian still technically retained the right to refuse to testify, he would have paid a steep price for so doing: He would have lost all benefits from the plea bargain; he could have been prosecuted for all his crimes; he couldn't claim the statute of limitations for any prosecution; all statements he already made pursuant to the agreement could be used against him. Plea Agreement at 2–3.

The government thus had every reason to believe Nourian would sing like a nightingale whenever it whistled the tune. This was the whole point of the cooperation agreement, three single-spaced pages designed primarily to hold Nourian to his word. In this context, telling the jury that "Nourian . . . has the right to remain silent," and that "the government can't force someone to talk" was highly misleading. Adding "[d]on't be misled that the government could have called Nourian" was simply false: The government *could* have called Nourian, and could have done so with a very great deal of confidence that he would testify.

■ Anyone can make a mistake. Words uttered spontaneously sometimes come out wrong; the exigencies of trial may make it hard to consider all the implications of a particular assertion. The mere fact of a misstatement to the jury therefore isn't the end of the matter. In determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it. *See* pp. 1323–24 *infra; United States v. Lopez–Alvarez,* 970 F.2d 583, 597 (9th Cir.1992). We also must consider whether the misstatement likely affected the verdict.

### A. The AUSA

The AUSA's misstatement came during his rebuttal argument to the jury, in response to defense counsel's argument that "Nourian was arrested. I submit to you that the government could have called him as a witness." RT 10/4/91 at 299–300.

Though it isn't clear how much time passed between defense counsel's challenge and the prosecutor's response, the prosecutor had at least a few minutes to ponder what to say. Moreover, the issue had come up earlier, when defense counsel requested an absent witness instruction. The government's lawyer thus had at least *some* time to consider how he would deal with defense counsel's absent witness argument. His response—that Nourian wasn't there because the government was powerless to compel him to appear—seems to have been the result of some deliberation, perhaps a misguided impression that such a response was appropriate.

That the prosecutor thought he was on solid ground is consistent with his subsequent actions. Although defense counsel objected to the government's statement, the prosecutor did not retract or modify it during the rest of his summation. Nor did the AUSA set the record straight a few minutes later, when—during a colloquy that takes up five pages of transcript—defense attorney Nessim argued that the AUSA's statement was improper because Nourian had, in all likelihood, entered into a cooperation agree-

---

**3.** The United States Attorney provided a copy of the cooperation agreement only after ordered to do so. This order, entered February 5, 1993, came after the government's admission in oral argument that such an agreement did exist. *See* p. 1320 *infra.* The agreement obligated Nourian to cooperate with the Office of the United States Attorney for the Southern District of New York, as well as with any other law enforcement agency designated by it. This would presumably include the faraway Office of the United States Attorney for the Central District of California.

ment.[4] While defense counsel struggled to articulate the issue to the district court, the prosecutor did nothing to let the court know that the factual premise underlying defense counsel's objection was true. Nor did the AUSA raise the matter with the court or opposing counsel after he'd had time to reflect on events and consult with his colleagues and superiors. And when the issue was again brought up by defense counsel in a motion for a new trial two months later, the AUSA didn't respond. CR 74 at 3–4.[5]

To this point, it's possible to attribute a certain naivete to the AUSA's conduct, an error of judgment that may have been driven by inexperience. The matter becomes more serious once the issue was joined on appeal. Kojayan's lawyer, in his opening brief, raised the issue of prosecutorial misconduct, quoting extensively from the relevant portion of the transcript. Kojayan Opening Brief at 16–22. While upbraiding opposing counsel for alleged misstatements,[6] the prosecutor was far more forgiving when it came to his own conduct. To begin with, he didn't even then acknowledge that he had told the jury something that wasn't true. On the contrary: "The prosecutor's comments," he said, "were all supported by the record before the jury." Government Brief in *Kojayan* at 24. He also asserted that "The Prosecutor's Comments In Rebuttal Argument Were A Proper Response to Defendant's Closing Argument." *Id.* at 22. In support, the AUSA portrayed himself as having said only that there was no evidence of Nourian's cooperation with the government, omitting any reference to his last statement: "Don't be misled that the government could have called Nourian."

Aside from refusing to acknowledge any wrongdoing on his own part, the AUSA aggressively attacked opposing counsel for making improper statements to the jury. He went so far as to assert—incorrectly—that the "district court ... found that defense counsel had asked the jury to draw an unfavorable inference from the government's failure to call a witness defense counsel knew would take the Fifth Amendment. (R.T. 10/4/91, 339; G.E.R. 121)." *Id.* at 22–23.[7] The AUSA's central argument, however, was that defense counsel had done something improper by asking the jury to infer that Nourian was available to the government, and it was therefore "fair advocacy" for the prosecutor to assert the contrary, even if he knew it was false. *Id.* at 23–24.

As we note below, there was nothing at all wrong with what defense counsel said and did. *See* pp. 1320–21 *infra.* More significantly, we're taken aback by the government's assertion that it is *ever* "fair advocacy" for a lawyer to make false statements in court. Even had defense counsel made a factual misstatement, even had he committed an impropriety, this surely would have given opposing counsel no license to do the same. The claim of impropriety should have been addressed to the court, not remedied through self-help.[8]

4. "I think the government has misled the jury and kept us from having evidence that would allow us to set the record straight." RT 10/4/91 at 316. "[I]t is improper for the government to say that it has not entered into a cooperation agreement with Nourian if it had in fact entered into [one]." *Id.* at 336. These statements were made after summation but before the jury started deliberating. It's disappointing that the learned district judge, well known for his expertise and fairness, overlooked the opportunity to clear up a serious charge of prosecutorial misconduct by asking the prosecutor whether there was a cooperation agreement.

5. Defendants made two prosecutorial misconduct arguments—this one and another, which was a sure loser. The government characterized the defendants' charges as "[f]rivolous," but responded only to the latter argument. CR 74 at 3.

6. "The only misstatements are in appellant's brief for raising such utterly false and frivolous

[sic] claims.... [¶] Again, contrary to defendant's own false misstatements [sic] in his brief.'...." Government's Brief in *Kalfayan* at 20. Defense counsel's alleged misstatements related to a different issue.

7. The cited passage discloses only that the district court inquired whether that's what defense counsel was doing; counsel responded that he'd been told that Nourian would take the Fifth if called by the defense, not the prosecution. There was no finding of any sort by the district court.

8. Two other points in the government's brief deserve comment. The first is the assertion that "[i]t was improper for defendant to argue that the jury could draw a negative inference from the government's failure to grant Nourian immunity. [*United States v.*] *St. Michael's Credit Union*, 880 F.2d [579, 598 (1st Cir.1989)]." Government Brief in *Kojayan* at 22. *St. Michael's* held only that "the district court properly refused

# 1320

## B. The Supervisors

Troubled as we are by the prosecutor's conduct, we're more troubled still by the lack of supervision and control exercised by those above him. The AUSA's superiors seem to have been unaware that anything at all was amiss until after oral argument in this court. It was during that argument that the government first disclosed Nourian's status:

[Q]: Was there a cooperation agreement?

AUSA: Well, your honor, that is not something that's in the record.

[Q]: I understand. Was there a cooperation agreement?

AUSA: There was an agreement with the Southern District of New York and [Nourian], yes.

Transcript of 11/5/92 Oral Argument at 15.

How can it be that a serious claim of prosecutorial misconduct remains unresolved—even unaddressed—until oral argument in the Court of Appeals? Surely when such a claim is raised, we can expect that someone in the United States Attorney's office will take an independent, objective look at the issue. The claim here turned entirely on verifiable facts: A dispassionate comparison between the transcript of the AUSA's statement to the jury and Nourian's plea agreement would have disclosed that the defense was right and the government was wrong. Yet the United States Attorney allowed the filing of a brief in our court that did not own up to the problem, a brief that itself skated perilously close to misrepresentation. See p. 1319 & notes 7 & 8 supra.

But that's not all. After the oral argument before us, we gave the government an opportunity to rethink its position. Order of 11/5/92. The United States Attorney wrote us a week later, saying he'd "now had an opportunity to review the issues raised in these appeals" and requesting that he "be afforded an opportunity to modify our position regarding the nature of certain statements made by government counsel during closing argument." Letter of 11/12/92. Hav-

ing granted the additional time, see Order of 11/13/92, we infer that the Supplemental Brief filed on November 30, 1992, is the United States Attorney's reasoned response to the issue.

This supplemental brief falls disappointingly short. While for the first time "recogniz[ing] and conced[ing] that the prosecutor's comments in closing argument were misleading" and "improper," Government Supp. Brief at 1, 11 n. 2, the new brief is remarkably similar in approach to the government's original brief. Its two-part strategy is to minimize the prosecutor's misconduct and place the blame for it on opposing counsel. Thus, the government tells us the AUSA's comments "were limited in nature and, as the district court recognized, were prompted by defense counsel's own improper attempt to focus the jury's attention on matters outside the record," id. at 2, and that "[t]he prosecutor's remarks, albeit misleading, were an isolated instance of error prompted by defendants' improper reference to matters outside the record," id. Both prongs of the government's analysis deserve careful attention.

■ We begin with the government's blame-shifting. While the government refers to defense counsel's allegedly improper conduct eight times, it never explains what defense counsel did wrong. As we read the record, all that happened was this: Defense counsel said "Nourian was arrested. I submit to you that the government could have called him as a witness." RT 10/4/91 at 299–300. The first part of the statement was certainly a fact in the record; Nourian was arrested, as the government argued to the jury, see RT 11/4/91 at 311. The second was well within the realm of proper argument; it invited the jury to infer that, since the government had taken physical possession of Nourian's body, it probably had ways of getting him into court if it wanted to. Our case law and model jury instructions specifically authorize counsel to argue such a theory to

[the] missing witness instruction." 880 F.2d at 598. Nothing in St. Michael's even remotely supports the proposition that it would have been improper for defense counsel to argue the point.

The second is counsel's statement that "even assuming the prosecutor's argument was im-

proper, it did not constitute plain error." Government Brief in Kojayan at 24 (internal quotation marks omitted). Counsel's reference to plain error is spurious and misleading, as defendant objected at least three times to the prosecutor's closing argument.

the jury. *See* note 2 *supra.* The introductory phrase "I submit" was an important flag in alerting the jurors that defense counsel was not stating a fact, but asking them to use their common sense in drawing an inference. *See United States v. Necoechea,* 986 F.2d 1273, 1279 (9th Cir.1993) ("These 'I submit' statements do not constitute vouching.... [They are] simply an inference from evidence in the record. [They are not] a reference to extra-record facts....").

There followed a most peculiar objection by government counsel:

> AUSA: Objection, Your Honor, Fifth Amendment rights of another person.

RT 10/4/91 at 300.[9] The district court overruled the objection, and with good reason: It was nothing but a disguised argument, an effort by government counsel to insinuate his rebuttal point in the midst of defense counsel's summation.[10]

Defense counsel then continued:

> Mr. Nessim: The government could have given him immunity. The defense does not have that power. I would submit to you that Nourian may very well be cooperating with the government at this very time. They could have called him and they didn't.

*Id.* These comments were all proper. Defense counsel didn't say the government had given Nourian immunity; he said it *could have* done so, which is certainly true. It is equally true that the defense could not give Nourian immunity. The next two statements, again, invite the jury to infer ("I would submit to you") that Nourian must have been cooperating with the government and that the government could have gotten him to testify had it wanted to.

We fail to see how any of this is even remotely improper. Lawyers are supposed to invite the jury to infer things from the evidence. When a prosecutor asks jurors to deduce a defendant's guilt from circumstantial evidence, for example, he's urging them to take a leap beyond the record, to use their common sense in reaching a conclusion not explicitly spelled out by the evidence. This is the very essence of jury summation.

While casting aspersions at opposing counsel, the government's supplemental brief overlooks two significant differences between defense counsel's argument and its own. First, unlike defense counsel, the prosecutor went well beyond asking the jury to *infer* matters outside the record. He actually made unsupported factual claims. When a lawyer asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: "Look, I know a lot more about this case than you, so believe me when I tell you X is a fact." This is definitely improper.

Defense counsel also asked the jury to infer only things that he believed in good faith *might* be true. While defense counsel didn't know that Nourian had a cooperation agreement, *see* p. 1317 *supra,* he had no reason to doubt it. The government's lawyer, by contrast, made factual assertions he well knew were untrue. This is the difference between fair advocacy and misconduct. *Compare* note 7 *supra.*

Impugning opposing counsel's integrity is a very serious matter; it should be undertaken only after careful analysis, particularly when the alleged misconduct is used to explain or mitigate one's own. Here, an objective review of the record would have disclosed that defense counsel stayed well within the bounds of propriety; the government's strident assertions to the contrary are unsupported.

■ Equally unsupported is the government's assertion that the AUSA's misstatement to the jury was justified by the "invited response doctrine." This doctrine may excuse certain arguments by government counsel that would normally be reversible error. *United States v. Young,* 470 U.S. 1, 11, 105

---

9. Even though this objection sheds considerable light on defense counsel's next statement, the government omits it in its supplemental brief. Government Supp. Brief at 5.

10. The objection was defective on three separate grounds. First, the government has no standing to assert the Fifth Amendment rights of third parties. Second, even if it did, defense counsel's argument couldn't possibly have jeopardized the rights of Nourian, who wasn't a defendant in this case. Finally, because the AUSA knew full well that Nourian had given up his Fifth Amendment rights, he had no good faith basis for raising the objection.

S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). But it can't sanitize the prosecutor's misstatements to the jury. Surely government counsel couldn't have asserted that Nourian failed to testify because he was dead or had left the country. No more could he claim the government was barred from calling Nourian because he had a Fifth Amendment right not to testify.

Nor are we impressed by the second prong of the government's supplemental brief, which is to minimize the effect of the prosecutor's misconduct. While the government eleven times refers to the AUSA's argument to the jury as "misleading," not once does it call it "false" or "untrue." This distinction matters. False and untrue mean contrary to fact; "misleading" suggests something literally correct, but likely to direct the listener away from the truth. Footnote 1 of the government's supplemental brief, in fact, boldly asserts the AUSA's comments "were, to some extent, technically accurate. The prosecutor did not state that Nourian had not entered into a cooperation agreement, *but rather only noted* that there 'was not a shred of evidence' relating to such an agreement." Government Supp. Brief at 9 n. 1 (emphasis added).

How can the government possibly say this? Unlike defense counsel, who carefully preceded each departure from the record with a qualifier like "I submit," the prosecutor categorically asserted that Nourian "has Fifth Amendment rights. He has the right to remain silent." The AUSA also admonished the jury: "Don't be misled that the government could have called Nourian." Contrary to the government's characterization, the prosecutor much more than "only noted that there 'was not a shred of evidence' relating to such agreement" in the record; he told them point-blank that no such agreement existed. In a misguided attempt to stand by its lawyer, the government sweeps under the rug the most troublesome part of his statement to the jury.

■ As disappointing as what is said in the government's supplemental brief is what is not said. While the government condemns opposing counsel for speculating about the existence of the cooperation agreement, the government lawyers who supposedly took a detached and independent look at the problem never once mention *why* it became necessary for defense counsel to speculate. After all, the defense had made a *Brady* request about whether Nourian had signed a cooperation agreement, and the government had a continuing obligation to provide *Brady* materials to the defense. If, before trial, the AUSA was uncertain about the materiality of Nourian's plea agreement, he could have submitted it for the district court's *in camera* inspection and evaluation. *See United States v. Gardner,* 611 F.2d 770, 775 (9th Cir.1980). When defense counsel later requested a missing witness instruction and their request foundered because they were unaware of the government's agreement with Nourian, the government was required, under *Brady,* to disclose this evidence. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. The evidence was "favorable to [the] accused" because it might have convinced the court to give the instruction. *Id.* The instruction, in turn, would have told the jury that Nourian was not only available but that the prosecution could compel his appearance if it so chose. This might have led the jury to infer that his testimony would have been unfavorable to it. Even if the court refused to give the instruction, evidence of Nourian's agreement would have strengthened defense counsel's argument to the jury that his live testimony would have explained away his hearsay testimony. This case was close, and we find a "reasonable probability" that, had this evidence been disclosed, the result would have been different; the evidence was therefore material. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987).

Most disappointing of all, perhaps, is the government's failure to acknowledge that the prosecutor's misconduct was far more than a simple slip of the tongue, more than a temporary misstep. As we discussed at some length above, the Assistant United States Attorney did nothing whatever to own up to the problem; he did not inform the district court, this court or opposing counsel of the misstatement of fact in his closing argument. Before us, more than a year after trial, in a brief the AUSA tells us "was reviewed by the

chief of our appellate section," Transcript of 11/5/92 Oral Argument at 17, the government continued to argue that the prosecutor's conduct was proper, denied any wrongdoing and characterized his statements as a "fair response" to defense counsel's argument, Government Brief in *Kojayan* at 23. Nor does the government's supplemental brief explain why it took questions from us at oral argument before the government would disclose the cooperation agreement; why it was only after an order from this court that the United States Attorney finally "recognize[d] and concede[d] that the prosecutor's comments in closing argument were misleading" and "improper."

While the government's supplemental brief contains various references to the "regrettable and inappropriate" nature of the incident, Government Supp. Brief at 9 n. 1, it shows no appreciation of the seriousness of the misconduct, no hint of contrition. Remarkably, the government argues that we needn't worry too much about the AUSA's misstatement because "[t]he effect of the prosecutor's improper comments was, in essence, the same as if the prosecutor had followed the proper course and requested intervention by the district court." *Id.* at 11 n. 2. Acceptance of responsibility this is not.

### III

Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. *See, e.g., Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). While lawyers representing private parties may—indeed, must—do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. *See United States v. Hill,* 953 F.2d 452, 458 (9th Cir.1991); Barbara Allen Babcock, *Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel,* 34 Stan.L.Rev. 1133, 1141 (1982). As Justice Douglas once warned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindi-

cate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting).

The government here has strayed from this responsibility. Quite aside from the major and minor trespasses and evasions catalogued above, we must ask the broader question: How did all this come about? The answer isn't particularly edifying: It is because the government's lawyer made a strategic decision to present Nourian's evidence by way of hearsay, and then did everything he could to keep the defense from learning Nourian's whereabouts and the existence and nature of the cooperation agreement. While we're in no position to second-guess the government's decision not to bring Nourian to court, we see no justification for the prosecutor's refusal to give the defense whatever information he had about Nourian—the status of his criminal case, the nature and extent of any cooperation agreement. The government has never articulated why it withheld this information, saying only that "[t]he government ... is not required to be defendant's investigator." CR 23 at 4. Such hard-bitten litigation tactics are unbecoming a prosecutor. *See* Monroe H. Freedman, *Understanding Lawyers' Ethics* (Chapter 11—"Prosecutors' Ethics") (1990).

Turning to the remedy, the government vigorously argues that whatever error may have been committed by its lawyer, it was minor and harmless, and that defendants would have been convicted anyhow. We are less sanguine. This was a close case: The jury deliberated for over two days after a one-and-a-half-day trial. CR 56, 57, 63. Evidence of Nourian's plea agreement might well have helped convince the jury to reach a not guilty verdict for one or both of the defendants. Had the prosecutor done his job—had he disclosed to the defendants that Nourian was cooperating, as required by *Brady,* had he stuck to the truth in his arguments—the verdict could well have been different. Evidence matters; closing argument matters; statements from the prosecutor matter a great deal. The government deprived the defendants of an opportunity to

put on what could have been a powerful defense. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (where prosecutor knowingly uses perjured testimony, error isn't harmless unless there's no reasonable likelihood that the misconduct influenced the verdict).

Having determined the convictions must be reversed, we must next consider whether to allow the government to retry the defendants. The normal rule, of course, is that where prejudicial error is committed at trial, the case will be sent back for a retrial. But where, as here, the error is one of prosecutorial misconduct, we must take into account considerations beyond this case. Quite as important as assuring a fair trial to the defendants now before us is assuring that the circumstances that gave rise to the misconduct won't be repeated in other cases.

Much of what the United States Attorney's office does isn't open to public scrutiny or judicial review. *See, e.g., United States v. Redondo–Lemos,* 955 F.2d 1296 (9th Cir. 1992). It is therefore particularly important that the government discharge its responsibilities fairly, consistent with due process. The overwhelming majority of prosecutors are decent, ethical, honorable lawyers who understand the awesome power they wield, and the responsibility that goes with it. But the temptation is always there: It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win. *See, e.g., United States v. Montgomery,* 998 F.2d 1468, 1477 (9th Cir. July 13, 1993) (finding a "complete absence of effort, a complete absence of control, and a near complete absence of demonstrated cooperation" on part of government in producing confidential informant); *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir.1991) ("We fear that given the importance of [a witness's] testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—[that he] was not telling the truth."); *Brown v. Borg,* 951 F.2d 1011, 1015 (9th Cir.1991) (state prosecutor kept exculpatory evidence secret); *Reutter v. Solem,* 888 F.2d 578, 581 (8th Cir.1989) (state prosecutor withheld *Brady* information and made grossly misleading statements in closing argument); *United States v. Kattar,* 840 F.2d 118, 127 (1st Cir.1988) ("[I]t is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an organization, individual, or series of events variously as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations.").

One of the most important responsibilities of the United States Attorney and his senior deputies is ensuring that line attorneys are aware of the special ethical responsibilities of prosecutors, and that they resist the temptation to overreach. "[T]raining to impart awareness of constitutional rights is an essential function of an office ... whose administration of justice the public [relies on]." *United States v. Foster,* 985 F.2d 466, 469 (9th Cir.1993). A recent Second Circuit case, *Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992), illustrates the disastrous consequences that can follow when this responsibility is not met. The prosecutors in *Walker* persisted in prosecuting a defendant—and lied and concealed evidence in the process—even though they were aware of his probable innocence. It took Mr. Walker nearly two decades to win his freedom. The *Walker* court found that the district attorney's failure to train or supervise her employees as to "such basic norms of human conduct [as] the duty not to lie or persecute the innocent" could be the basis of 42 U.S.C. § 1983 liability. *Id.* at 301.

Commenting on Mr. Walker's plight, Professor Stephen Gillers noted the great danger in "[u]ntrained lawyers wielding public power." *Under Color of Law,* ABA J., Dec. 1992, at 121. We share his concern. What we find most troubling about this case is not the AUSA's initial transgression, but that he seemed to be totally unaware he'd done anything at all wrong, and that there was no one in the United States Attorney's office to set him straight. Nor does the government's considered response, filed after we pointed out the problem, inspire our confidence that this kind of thing won't happen again.

The prosecutorial misconduct in this case deprived the defendants of due process of law. It contaminated their trial, and we

cannot say it was harmless. *See United States v. Kerr,* 981 F.2d 1050 (9th Cir.1992) (prejudicial vouching cause for reversal); *Brown v. Borg,* 951 F.2d 1011 (9th Cir.1991) (reversal where prosecutor knowingly introduced and argued from false evidence). In a situation like this, the judiciary—especially the court before which the primary misbehavior took place—may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events. We therefore **VACATE** the judgment of conviction and **REMAND** for the district court to determine whether to retry the defendants or dismiss the indictment with prejudice as a sanction for the government's misbehavior. *See United States v. Williams,* —— U.S. ——, ——, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (supervisory power "may be used as a means of establishing standards of prosecutorial conduct before the courts themselves."); *United States v. Bernal–Obeso,* 989 F.2d 331, 337 (9th Cir.1993); *United States v. Restrepo,* 930 F.2d 705, 712 (9th Cir.1991); *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991).