**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.

GREGORY L. REYES,
                *Defendant-Appellant.*

No. 08-10047

D.C. No.
CR-06-00556-1-
CRB

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.

STEPHANIE JENSEN,
                *Defendant-Appellant.*

No. 08-10140

D.C. No.
CR-06-00556-2-
CRB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
May 12, 2009—San Francisco, California

Filed August 18, 2009
Amended November 5, 2009

14925

Before: Mary M. Schroeder and Stephen Reinhardt,
Circuit Judges, and Louis H. Pollak,* Senior District Judge.

Opinion by Judge Schroeder

---

*The Honorable Louis H. Pollak, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

**COUNSEL**

Amber Rosen, San Jose, California, for the plaintiff-appellee.

Seth P. Waxman, Washington, DC., for defendant-appellant Gregory L. Reyes.

Steven A. Hirsch, Washington, DC., for defendant-appellant Stephanie Jensen.

**ORDER**

The opinion filed on August 18, 2009, slip op. 11195 is amended as follows: on slip Opinion page 11200, line 12, replace the word "reprehensibility" with the word "responsibility". Also, on p. 11207, lines 27-29, replace "The government even displayed for the jury a diagram explaining the prosecutor's position that the Finance Department did not know of the backdating." with "The government even displayed for the jury a diagram designating Elizabeth Moore as among the uninformed to explain the prosecutor's position that the Finance Department did not know of the backdating."

The petition for rehearing is denied.

No subsequent petition for rehearing or for rehearing en banc may be filed in this matter.

---

**OPINION**

SCHROEDER, Circuit Judge:

## I.   Introduction

Gregory Reyes and Stephanie Jensen appeal from their convictions for falsifying corporate books and records, and related charges, stemming from their participation in a scheme to reward employees with grants of backdated stock options. The options were backdated to a time when the company's stock price was low, but the options were not recorded on the company's books as an expense of the corporation, so the books showed the corporation to be more profitable than it was. The convictions represent the first criminal convictions for a backdating practice that was widespread in the late 1990s, particularly in the Silicon Valley, where the appellants' company was located.

We reverse Reyes' conviction because of prosecutorial misconduct in making a false assertion of material fact to the jury in closing argument. We affirm Jensen's conviction but vacate the sentence and remand for resentencing because the sentence improperly included an obstruction of justice enhancement for which responsibility lay primarily with Jensen's lawyer.

## II.    Facts and Procedural Background

Gregory Reyes was the Chief Executive Officer ("CEO"), and Stephanie Jensen was the Vice-President of the Human Resources Department, of Brocade Communication Systems, Inc. ("Brocade"), based in San Jose, California. The company is publically traded and engaged in the high-tech business of developing and selling network equipment and providing networking solutions. Because of the competitive demand for qualified information technology personnel in the Silicon Valley, the company began the practice of offering new personnel and valued employees compensation in the nature of stock options.

A stock option is the right to purchase a share of stock from a company at a fixed price, referred to as the "strike price," on or after a specified vesting date. In a rising market, stock options generally help companies recruit employees desiring to share in the company's growth and help persuade employees to stay with the company so that their increasingly valuable options may vest and be exercised.

In general, companies grant options with a strike price equal to the market price on the date the options are granted. "Backdating" stock options refers to the practice of recording an option's grant date and strike price retrospectively. Backdating is not itself illegal, provided that the benefit to the employees is recorded on the corporate books as a non-cash compensation expense to the corporation, in accordance with an accounting convention promulgated in 1972 referred to as

Accounting Principles Board Opinion No. 25. It is not now disputed that the options in this case were not recorded in the books as having been backdated.

On August 10, 2006, the government charged Reyes and Jensen with securities fraud, falsification of corporate books and records, and violating related statutes and regulations. Their cases were severed for trial and represented the first such prosecutions to go before a jury.

## A. The Reyes Trial

The jury convicted Reyes of conspiracy in violation of 18 U.S.C. § 371; securities fraud and making false filings with the Securities and Exchange Commission ("SEC") in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; falsifying corporate books and records in violation of 15 U.S.C. §§ 78m(b)(2)(A) and 78ff, and 17 C.F.R. § 240.13b2-1; and making false comments to auditors in violation of 15 U.S.C. § 78ff and 17 C.F.R. § 240.13b2-2.

At trial, Reyes' principal defense was that he, as CEO and sole member of the Board of Directors' Compensation Committee, signed off on the backdated options without any intent to deceive. He sought to establish reasonable doubt as to his intent by contending that Brocade's Finance Department was well aware of the backdated options and the fact that the options were not properly expensed out on the books. Reyes also argued that he relied in good faith on the accuracy of the Finance Department's documentation when he signed off on false financial statements.

The government witnesses provided evidence as to how this scheme operated and how Reyes participated in the scheme. One of the witnesses, Elizabeth Moore, who was an employee of the Finance Department and who administered Brocade's stock options, testified that she and other members

of the Finance Department did not know that the backdating was occurring.

Other, higher-up Finance Department employees, however, had given statements to the FBI describing their knowledge of the backdating scheme. Both prosecution and defense counsel were familiar with these statements. Those employees, who were themselves subject to possible criminal prosecution and had been targets of SEC civil suits, did not testify.

During trial, Reyes' position was that he relied on the Finance Department to make sure that the corporate books were accurate, and that he was not responsible for the false records. Reyes' counsel, in closing argument, therefore told the jury that the Finance Department knew about the backdating, thus supporting the defense position. The prosecutor, however, told the jury that the employees in the Finance Department "don't have any idea" that the backdating was occurring. The prosecutor thereby asserted to the jury facts that he knew were belied by the statements to the FBI from responsible Finance Department officers, and by SEC complaints that had been filed against some of the Finance Department employees alleging they knew about the scheme.

Reyes moved for a new trial on the basis of prosecutorial misconduct. He also sought a new trial on the separate basis of what he asserted to be a recantation of Elizabeth Moore's testimony that she did not know about the backdating. The district court denied the motions. Earlier, the court had denied a motion for directed verdict for insufficiency of the evidence to establish materiality, i.e., that knowledge of the backdating would have affected the judgment of a reasonable investor.

The district court sentenced Reyes to 21 months' imprisonment, and imposed a $15 million fine. This appeal followed.

**B.    The Jensen Trial**

In the Jensen trial, the principal issue was whether she knew that this was a fraudulent scheme and whether she pos-

sessed a criminal intent. Jensen sought an instruction that would have required the jury to find she knew what law she was violating, i.e., to find that the falsification was done "with the purpose of violating a known legal duty." The district court instead instructed the jury that it must find the government proved Jensen acted "knowing the falsification to be wrongful." *United States v. Jensen*, 532 F. Supp. 2d 1187, 1195 (N.D. Cal. 2008). The jury convicted Jensen on the two counts charged against her: (1) falsifying and aiding and abetting the falsification of books, records, and accounts in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, and 17 C.F.R. § 240.13b2-1; and (2) conspiracy to falsify books and records in violation of 18 U.S.C. § 371.

At sentencing, Jensen also argued she was within the provision of the penalty statute that exempts a defendant from imprisonment for violating a regulation if the defendant "had no knowledge of such rule or regulation." 15 U.S.C. § 78ff(a). The district court declined to hold she was within the "No Knowledge Clause," and sentenced her to a term of imprisonment of four months.

Jensen's term included an enhancement for obstruction of justice for her lawyer's reliance on a declaration made by Reyes. Her lawyer had obtained a severance of Jensen's trial from Reyes' on the basis of Reyes' false declaration stating that Jensen was without any culpability, that Reyes had told Jensen that there was no backdating, and that Reyes would testify at Jensen's trial if the trials were severed. Reyes did not testify at Jensen's trial.

The district court was understandably annoyed that the court had had to preside over two trials and had been misled by the false declaration. It imposed the obstruction of justice enhancement because Jensen was present in the courtroom when her attorney argued the motion to sever and did not interfere with her lawyer's presentation of the false declaration. The district court's order on Jensen's sentence is pub-

lished at *United States v. Jensen*, 537 F. Supp. 2d 1069 (N.D. Cal. 2008).

## III.    The Reyes Appeal

The Reyes trial was combative. The government had to prove Reyes was knowingly responsible for the false corporate records, and the stakes were high. The issue that is dispositive of Reyes' appeal concerns the government attorney's misconduct in falsely telling the jury that the Finance Department did not know about the backdating, when the prosecutor knew that their statements revealed that they did.

There is a threshold issue, however, of whether the government satisfied its burden of proving that the false records would have affected the judgment of a reasonable investor. If the government failed in its burden to establish the materiality of the falsification, then the prosecution must be dismissed, and no new trial would be possible. *Burks v. United States*, 437 U.S. 1, 18 (1978). The government did not, however, fail in its burden.

Materiality depends on the significance that a reasonable investor would assign to the withheld or misrepresented information. *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Id.* at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)).

**[1]** The prosecution did not present any witnesses who actually invested in Brocade's stock. The government relied on the expert testimony of three witnesses: (1) Steve Catricks, a portfolio manager and equity analyst at Delaware Investments, (2) Robert McCormick, an employee who was a proxy lawyer at Fidelity Investments, and (3) Dr. John Garvey, an accounting expert. Although Reyes now attempts to discredit

the witnesses' testimony because they made no personal decision to invest in Brocade's stock, the standard of materiality is judged from the perspective of a "reasonable investor," and is therefore an objective one. *See TSC Indus., Inc.*, 426 U.S. at 448. Reyes did not contest the expertise of these witnesses to present the testimony.

McCormick testified that Fidelity used guidelines for the voting of shares Fidelity owned in other companies. These guidelines were "designed to maximize shareholder benefit," and they instructed Fidelity managers to vote against plans that permitted a company to grant any backdated options. According to McCormick, Fidelity frowned upon granting backdated stock options because they result in share dilution, and they have a less incentivizing effect on employees than stock options that are not backdated. Catricks testified that granting backdated options inflates net income and earnings per share figures of the company, figures that Catricks stated he, as a reasonable investor, would want to know when he made his investment decisions.

McCormick's and Catricks' testimony further established that improper accounting of backdated options presents investors with an incorrect picture of a company's finances. Supporting their testimony, Dr. Garvey testified that Brocade's failure to expense more than $160 million from backdated options resulted in Brocade reporting profits in 2001 and 2002, when it should have reported large losses.

**[2]** We have recognized that information regarding a company's financial condition is material to investment. *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge."). The witnesses' testimony, taken cumulatively, and in the light most favorable to the prosecution, *United States v. Gonzalez-Torres*, 309 F.3d 594, 598 (9th Cir. 2002) (citation omitted), permitted a rational trier of fact to find beyond a reasonable

doubt that the omissions and misstatements were material to a reasonable investor.

There is also a claim of instructional error with regard to the jury's finding that misstatements to accountants were materially false. The instruction required the jury to find that the statements were capable of influencing actions of accountants, and did not expressly reference investors. In the circumstances of this case, there was no reversible error on this point. The main thrust of the government's case was that the false statements were capable of misleading investors. The statements were the same as those the jury found, in other counts, capable of influencing reasonable investors. The remaining instructional challenges relate to the false entries count (15 U.S.C. §§ 78m(b)(2)(A) and 78ff, and 17 C.F.R. § 240.1362.1). They are without merit.

We therefore turn to whether prosecutorial misconduct requires a new trial. The principal issue before the jury was one of intent. There was no question that Reyes signed off on stock option grants that were priced retrospectively, and that the backdating allowed Brocade to understate its compensation expenses. That was indeed the way that the alleged scheme was supposed to operate, by providing a valuable option to employees at no apparent expense to the company.

At trial, an issue as to Reyes' criminal state of mind was whether Reyes knew the corporate records falsely stated the company's financial condition by under-reporting the company's expenses. Reyes' defense was that he thought the transactions were properly accounted for, in reliance on the Finance Department's expertise to comply with accounting principles and SEC regulations. The government, however, argued that the Finance Department was unaware of the backdating, and thus powerless to get the accounting right. A key question therefore became whether the Finance Department knew that the backdating scheme was taking place.

**[3]** Statements made to the FBI by responsible employees in the Finance Department during the FBI's investigation established that Finance Department executives knew about the backdating and that one employee had resigned as a result of it. A lower-level Finance Department employee, however, Elizabeth Moore, testified for the government that she did not know about the scheme. During closing argument, the prosecutor did not confine his argument to the evidence before the jury or reasonable inferences that could have been drawn from that evidence. The prosecutor asserted as fact a proposition that he knew was contradicted by evidence not presented to the jury. In direct contravention of the statements given to the FBI by Finance Department executives that they did know about the backdating, the prosecutor asserted to the jury in closing that the entire Finance Department did not know about the backdating, and further that the government's theory of the case was that "finance did not know anything." "Our theory is that those people didn't know anything . . . . Elizabeth Moore says finance didn't know. Did you need everybody in the finance department to come and tell you that they didn't know?" The government even displayed for the jury a diagram designating Elizabeth Moore as among the uninformed to explain the prosecutor's position that the Finance Department did not know of the backdating. The prosecutor asked the jury to assume other employees of the Finance Department would testify that they did not know about Reyes' backdating procedure when the prosecutor knew they did.

In denying the defense's motion for a new trial, the district court focused not only on the prosecutor's misstatements, but on defense counsel's performance as well. Defense counsel had told the jury that the Finance Department did know, and told the jury that the Finance Department executives would have so testified if they had been called. In the district court's view, defense counsel was almost as culpable as the government because defense counsel asserted what the Finance Department knew about the backdating without calling

Finance Department executives as witnesses. According to the district court, defense counsel should have sought immunity for the witnesses, and then proved, through their testimony, that the Finance Department did know about the scheme.

It was not, however, the defense's burden to prove Reyes was innocent. It was the prosecutor's burden to prove he was guilty. Defense counsel made no knowingly false statements. The prosecutor did. Indeed, on appeal the government does not seriously dispute the falsity of the prosecutor's statements or the duty of the prosecutor to refrain from making such statements. Instead, it argues the misconduct was harmless.

In representing the United States, a federal prosecutor has a special duty not to impede the truth. The United States Department of Justice's Mission Statement describes the government's duty as one "to ensure fair and impartial administration of justice for all Americans." United States Department of Justice, About DOJ, http://www.usdoj.gov/02organizations/.

**[4]** There is good reason for such a high standard. A "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985) (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)). For this reason, it is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt. *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) (citing *United States v. Kojayan*, 8 F.3d 1315, 1318-19 (9th Cir. 1993)).

The district court, in denying the motion for a new trial, apparently did not view the prosecutor's statements to be culpably false, finding that the Finance Department witness statements that were provided to the FBI did not "put the lie" to the government's arguments. We are unable to agree. The

FBI witness statements affirmatively assert that Bob Bossi, Brocade's controller, knew backdating was occurring regularly and that Reyes was backdating stock options. The witness statements also reveal that Bossi complained about fraudulent practices relating to at least one employee's stock options, and that Bossi eventually resigned his position at Brocade. The witness statements further reveal that Tony Canova, a Chief Financial Officer at Brocade, also knew backdating was taking place. Bossi and Canova even discussed discovering specific instances of inconsistencies in stock option paperwork, and attributed the errors to Reyes' backdating practice.

Moreover, in civil suits brought by the SEC, parallel evidence was produced about the knowledge of Finance Department executives. For example, the SEC complaint charging Michael Byrd, a Chief Financial Officer at Brocade, did not state that Byrd was "deceived" regarding the stock option grant given to Brocade employee Richard Geruson, as the prosecutor had argued during closing argument during Reyes' case. Rather, the civil complaint charged that Byrd acted with knowledge of the backdating of Geruson's grant. The SEC's complaint against Canova clearly alleges that Canova did know that backdating was occurring. As a joint press release emphasized, the FBI, SEC, and U.S. Attorney's Office forged a strong, cooperative relationship in pursuing civil and criminal punishment for misconduct relating to backdating Brocade stock options. Press Release, U.S. Securities and Exchange Commission, U.S. Attorney's Office and SEC Separately Charge Former Brocade CEO and Vice President in Stock Option Backdating Scheme (July 20, 2006), http://www.sec.gov/news/press/2006/2006-121.htm. The prosecution is legally charged with responsibility for information uncovered in its civil investigations and may be required to disclose it in criminal cases that it prosecutes. *See e.g.*, *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995). It is charged with knowledge of the parallel SEC investigation.

**[5]** The record demonstrates that the prosecution argued to the jury material facts that the prosecution knew were false, or at the very least had strong reason to doubt. Reyes objected below and therefore preserved the issue. Both Reyes and the government agree in their briefs that the error is not harmless if we conclude it is more likely than not that the misconduct materially affected the fairness of the trial. *See United States v. McKoy*, 771 F.2d 1207, 1212 (citing *Young*, 470 U.S. at 13 n.10).

**[6]** Although the government's case was relatively strong, the jury took seven days to deliberate, and the case was complex and technical. Moreover, the prosecutor's statements were particularly prejudicial given that Reyes' defense rested on his delegating his responsibilities to others and reliance on them. At the end there was considerable focus on the issue of what the Finance Department knew. The prosecutor's false statements went directly to this issue. Moreover, the statements were made during closing arguments, both orally and visually, and closing statements from the prosecution "matter a great deal." *Kojayan*, 8 F.3d at 1323. Deliberate false statements by those privileged to represent the United States harm the trial process and the integrity of our prosecutorial system. We do not lightly tolerate a prosecutor asserting as a fact to the jury something known to be untrue or, at the very least, that the prosecution had very strong reason to doubt. *See Blueford*, 312 F.3d at 968. There is no reason to tolerate such misconduct here.

**[7]** Reyes goes further on appeal and argues that the misconduct was so flagrant that the indictment should be dismissed. *See United States v. Chapman*, 524 F.3d 1073, 1085-87 (9th Cir. 2008) (noting that dismissal of the indictment may be warranted where the prosecutor's actions rise to the level of flagrant prosecutorial misconduct, a defendant suffers substantial prejudice, and no lesser remedial action is available for the misconduct). Although we do not agree with the district court that the prosecutor may have been innocent of

deliberate false statements, we recognize there were aggressive tactics on both sides. We do not conclude the prosecutor's conduct was so egregious as to require dismissal of the prosecution. Reyes' case must be remanded for a new trial.

## IV.    The Jensen Appeal

Jensen's appeal first challenges a jury instruction given in her case. She also challenges her sentence.

**[8]** Jensen's instructional challenge relates to the statutory term "willfully." The substantive provision of the Securities and Exchange Act of 1934 ("Act") at issue in this case requires issuers of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). This provision was an amendment to the Act enacted by the Foreign Corrupt Practices Act of 1977. *See* Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494. In turn, 15 U.S.C. § 78m(b)(5) provides that "[n]o person shall knowingly falsify any book, record, or account described" above.

The criminal penalty provision applicable to Jensen's case is 15 U.S.C. § 78ff(a), which provides penalties for willful violations and false and misleading statements:

> Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement . . . which statement was false or misleading with respect to any material fact, shall upon con-

viction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both, . . . but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

Jensen proposed a jury instruction that would have required the jury to find that the falsification was done "with the purpose of violating a known legal duty," or that the falsification was "unlawful." It therefore would have required the jury to find Jensen knew she was violating a securities law. The district court rejected her proposed instructions, and instructed the jury that they must find that Jensen falsified or intentionally caused to be falsified books, records, or accounts, "knowing the falsification to be wrongful." *Jensen*, 532 F. Supp. 2d at 1195.

**[9]** The Supreme Court has recognized that the meaning of "willfully" is often influenced by the context in which it is used. *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994). The district court's instruction in this case was in line with this court's interpretation of "willfully" in the securities context. In *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004), this court interpreted the meaning of willfully in § 78ff(a). In upholding a conviction for securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5, we held in *Tarallo* that willfully means "intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful." *Id.* at 1188 (emphasis in original). *Tarallo* thus rejected the instruction Jensen seeks.

Jensen nevertheless argues that a higher scienter requirement is warranted because the substantive securities provision she violated involved books, records, and accounts. According to Jensen, the knowing falsification of books, records, and accounts is not "inevitably nefarious," *see Ratzlaf*, 510 U.S.

at 144, and therefore a higher scienter requirement is necessary to prevent ensnaring innocent persons. Jensen tries to equate a violation of 15 U.S.C. § 78m(b)(5) to other violations in which the word "willfully" requires knowledge of the law. She relies on criminal tax, *see Cheek v. United States*, 498 U.S. 192, 201 (1991), and financial structuring cases, *see Ratzlaf*, 510 U.S. at 149.

**[10]** This argument is foreclosed by *Tarallo*. *Tarallo* observed that our circuit and others have rejected the argument that, in the context of the securities fraud statutes, willfulness requires a defendant know that he or she was breaking the law. *Tarallo*, 380 F.3d at 1187-88 (discussing *United States v. Charnay*, 537 F.2d 341, 351-52 (9th Cir. 1976), and *United States v. Peltz*, 433 F.2d 48, 54 (2d Cir. 1970)). The "knowing" requirement protects those who accidentally record incorrect information because, for example, they are confused by accounting rules. The district court correctly instructed the jury that it had to find that Jensen "was aware of the falsification and did not falsify through ignorance, mistake, or accident." There is no higher standard for a willful violation of the securities laws.

**[11]** Jensen also tries to distinguish *Tarallo* on the ground that she was charged with the provision that prohibits "knowingly" falsifying books and records, whereas the defendant in *Tarallo* was charged with violating a provision that was silent on the requisite level of intent. In both this case and *Tarallo*, however, the penalty provision at issue punishes "willful" violations of the substantive provisions. 15 U.S.C. § 78ff(a). A "knowing" falsification does not require knowledge of the securities laws being violated. On its face, the provision means only that the defendant must knowingly commit the act of falsification. On the basis of the language and structure of the statute, there is no textual reason to hold "knowingly," as used in § 78m(b)(5), was intended to modify or connote a higher scienter requirement than "willfully," as used in § 78ff(a).

**[12]** Moreover, Congress actually explained its understanding of "knowingly" in connection with the 1977 amendments to the securities laws that added 15 U.S.C. §§ 78m(b)(2) and (b)(3). In an early version of the legislation, the Senate Report stated:

> The amendments to section 13(b) prohibiting the falsification of corporate books and records and the making of misleading representations to auditors are not intended to make unlawful conduct which is merely negligent. To clarify the purpose of these paragraphs, therefore, the committee inserted the term 'knowingly' in appropriate places in both paragraphs (3) and (4). As explained to the committee, the term 'knowingly' connotes a 'conscious undertaking.' Thus these paragraphs proscribe and make unlawful conduct which is rooted in a conscious undertaking to falsify records or mislead auditors through a statement or conscious omission of material facts.

> The committee believes that the inclusion of the 'knowingly' standard is appropriate because of the danger, inherent in matters relating to financial recordkeeping, that inadvertent misstatements or minor discrepancies arising from an unwitting error in judgment might be deemed actionable. *The committee does not, however, intend that the use of the term 'knowingly' will provide a defense for those who shield themselves from the facts. The knowledge required is that the defendant be aware that he is committing the act which is false—not that he know that his conduct is illegal.*

S. Rep. No. 95-114, at 9 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098, 4107 (emphasis added). The final report on § 78m(b)(5) that was adopted in 1988 and that provided it

was a crime to "knowingly falsify" books or records, explained its meaning as follows:

> The Conferees intend to codify current Securities and Exchange Commission (SEC) enforcement policy that *penalties not be imposed for insignificant or technical infractions or inadvertent conduct.* The amendment adopted by the Conferees accomplishes this by providing that criminal penalties shall not be imposed for failing to comply with the FCPA's books and records or accounting control provisions. This provision is meant to ensure that criminal penalties would be imposed where acts of commission or omission in keeping books or records or administering accounting controls *have the purpose of falsifying books, records or accounts,* or of circumventing the accounting controls set forth in the Act. *This would include the deliberate falsification of books and records* and other conduct calculated to evade the internal accounting controls requirement.

H.R. Conf. Report. No. 100-576, 917 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1950 (emphases added). The district court correctly concluded that the congressional history confirms that Congress intended "knowingly" only to require that the jury find that Jensen "was aware of that falsification and did not falsify through ignorance, mistake, or accident." *Jensen*, 532 F. Supp. 2d at 1195.

**[13]** With respect to her sentence, Jensen first challenges the district court's ruling that Jensen could be imprisoned for her violation of the books, records, and accounts provision because she had failed to prove by a preponderance of the evidence that she qualified for the protection of the No Knowledge Clause. *See Jensen*, 537 F. Supp. 2d at 1073-75. The relevant statute provides that "no person shall be subject to imprisonment . . . for the violation of any rule or regulation

if he proves that he had no knowledge of such rule or regulation." 15 U.S.C. § 78ff(a). This provision is an affirmative defense to a sentence of imprisonment, and the burden to prove the defense is on the defendant. *United States v. O'Hagan*, 521 U.S. 642, 677 n.23 (1997).

**[14]** The district court framed the question as "whether Jensen has satisfied her burden of proving by a preponderance that she was unaware of a SEC rule or regulation prohibiting the falsification of books and records." *Jensen*, 537 F. Supp. 2d at 1075. This was the proper formulation. *See O'Hagan*, 521 U.S. at 652 ("[A] defendant may not be imprisoned for violating Rule 10b-5 if he proves that he had no knowledge of the Rule."). Other circuits have also observed that proof of no knowledge of the rule "can only mean proof of an ignorance of the substance of the rule, proof that the defendant did not know that [his or her] conduct was contrary to law." *United States v. Schwartz*, 464 F.2d 499, 509 n.16 (2d Cir. 1972) (citing *United States v. Lilley*, 291 F. Supp. 989, 993 (S.D. Tex. 1968)).

**[15]** The evidence showed that Jensen tried to hide the backdating scheme and was conscious of her wrongdoing. Such evidence included Jensen's attempt to minimize the obviousness of the backdated options, concealing the way options were actually dated, and directing employees to not communicate about options over the phone or email. Based on this evidence, and more, the district court appropriately concluded that Jensen had not carried her burden of establishing that she had no knowledge of the SEC rule prohibiting the falsification of books and records. *Jensen*, 537 F. Supp. 2d at 1072.

Jensen's second sentencing challenge relates to the obstruction of justice enhancement to her prison sentence. The enhancement was for obtaining a severance of her trial from Reyes'. Reyes and Jensen were jointly indicted, and Jensen moved to sever their trials on the ground that Reyes was a

critical witness who could provide exculpatory evidence for her. To support this position, Jensen's counsel submitted an ex parte declaration by Reyes under seal. In relevant part, Reyes declared that if the trials were severed, he would testify that he and Jensen did not conspire to backdate. He further declared that only he had the authority to choose the date or price of stock options, not Jensen, and that he told Jensen that he was not backdating stock options.

In arguing for the severance motion, Jensen's counsel asserted that Reyes' declaration was "as exculpatory as it gets." The court thus granted the severance on the basis of Jensen's counsel's argument that Reyes would provide exculpatory testimony. Jensen did not call Reyes to testify at her trial.

**[16]** Because the district court had granted the severance on a false premise, the court imposed an enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. That sentencing guideline provides a two-level increase in the offense level "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense[.]" U.S.S.G. § 3C1.1. Although it was Jensen's counsel who obtained the severance and solicited Reyes' declaration, the district court held that Jensen was responsible for the court's reliance on Reyes' false declaration, because Jensen acted willfully in allowing her counsel to present the declaration and Jensen knew Reyes' declaration was false or severely misleading.

**[17]** There is no evidence that Jensen procured Reyes' declaration. Jensen's attorney even told the district court that counsel was responsible for obtaining the declaration and submitting it to the district court. Unlike some other obstruction

cases, where the defendant threatened or attempted to influence a witness, *see e.g.*, *United States v. Sayetsitty*, 107 F.3d 1405, 1410 (9th Cir. 1997), or where the defendant personally suborned witness perjury, *see e.g.*, *United States v. Garcia*, 135 F.3d 667, 671 (9th Cir. 1988), this enhancement was based on the conduct of defense counsel. The sentencing guidelines do not suggest an obstruction of justice enhancement can be imposed for a defense attorney's arguments. The guidelines provide that a defendant is accountable only for the conduct of others that he or she helped bring about or cause. *See* U.S.S.G. § 3C1.1 cmt. 9 ("Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused."). Our law on obstruction of justice is consistent with this limitation. *See e.g.*, *United States v. Collins*, 90 F.3d 1420, 1423 (9th Cir. 1996) (upholding enhancement where defendant personally told two witnesses to give police false statements, as evidenced by recorded calls from jail).

**[18]** We affirm Jensen's conviction but vacate her sentence and remand for resentencing without the enhancement for obstruction of justice.

## V.   Conclusion

We reverse Reyes' conviction and remand for a new trial. We affirm Jensen's conviction, vacate her sentence, and remand for resentencing.

**Affirmed in part, reversed in part, and remanded.**