**WANG Zong Xiao, Plaintiff–Appellee,**

**v.**

**Janet RENO, in her capacity as Attorney General of the United States; Michael J. Yamaguchi, in his capacity as United States Attorney for the Northern District of California; Reginald L. Boyd, in his capacity as United States Marshal for the Northern District of California;**

---

Doris Meissner, in her capacity as Commissioner of the Immigration and Naturalization Service, and David Ilchert, in his capacity as District Director for the Immigration and Naturalization Service, Defendants–Appellants.

No. 93–17262.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1995.

Decided April 12, 1996.

John S. Koppel, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, for defendants-appellants.

Cedric C. Chao (argued), John D. Danforth and Ruth N. Borenstein, on the brief, Morrison & Foerster, San Francisco, California, for plaintiff-appellee.

R. William Ide III, Douglas R. Young, Tamar Pachter, and Kelly A. Randall, American Bar Association, Chicago, Illinois, as amicus curiae.

Barry P. Helft, Ephraim Margolin, San Francisco, California, National Association of Criminal Defense Lawyers and California Attorneys for Criminal Justice, as amici curiae.

Before: SCHROEDER, REINHARDT * and TROTT, Circuit Judges.

## OPINION

PER CURIAM:

The district court found that United States officials and prosecutors engaged in an extraordinary pattern of misconduct that violated the Fifth Amendment due process rights of Wang Zong Xiao ("Wang"), a prosecution witness brought to the United States to testify falsely in an international drug conspiracy case. To remedy the constitutional violations, and to protect Wang from future torture in China for his refusal to testify falsely, the district court permanently enjoined the Attorney General of the United States, and other Justice Department officials ("govern-

---

* Judge Thomas Tang was originally a member of this panel. He participated in the oral argument and made material contributions to the preparation of the opinion. After his death, Judge Rein- hardt was drawn to replace Judge Tang. Judge Reinhardt has, *inter alia,* read the briefs, reviewed the record, and listened to the tape of oral argument.

ment") from removing Wang from the United States or from returning him to the custody of officials from the People's Republic of China ("PRC" or "China"), *see Xiao v. Reno,* 837 F.Supp. 1506, 1511–44 (N.D.Cal.1993) ("*Wang II*"). The government appeals the district court's exercise of jurisdiction and issuance of a permanent injunction. We affirm.

## BACKGROUND

United States officials brought Wang Zong Xiao, a citizen of China, to San Francisco in December 1989 to serve as a federal prosecution witness in an international drug conspiracy trial against Leung Tuk Lun, Chico Wong, and Andrew Wong. Wang had allegedly been involved in the conspiracy known as the "Goldfish" case. Federal officials arranged for his parole into the United States in order to obtain his testimony regarding Leung's direct involvement with the heroin conspiracy. The Leung trial ended in a mistrial, however, after Wang changed his testimony and revealed that Chinese authorities had brutally coerced him into falsely implicating Leung. Wang's decision not to perjure himself may have saved him in the American court; however, the public disclosure of Wang's truthful testimony removed any possibility that he would receive leniency in China and raised the possibility that he would be executed there.

As described in more than thirty pages in the district court's opinion, *Wang II,* 837 F.Supp. at 1511–44, the events leading up to Wang's parole into the U.S. are as follows. On March 12, 1988, PRC police officials arrested Wang in Shanghai for his participation in a heroin transaction. The police kicked him, dragged him along the street, blindfolded him, and took him to an interrogation room. At Wang's first interrogation, which lasted from 5:00 p.m. to 10:00 p.m., PRC officials beat him and used an electric cattle prod to shock him several times. At his second interrogation, which immediately followed the first and lasted until 7:00 a.m. the next day, officials forced him to stand for up to one hour at a time despite his requests for sleep, refused to provide food or drink, and abused him verbally, including telling him

that he was "like a piece of meat on our chopping board; we can chop you any way we want." After Wang's second interrogation, officials allowed him to sleep for one hour before shocking him with a cattle prod, and interrogating him almost continuously for another seventeen hours. This pattern of interrogation continued for close to a month, during which officials interrogated Wang more than thirty times and forced him to give multiple confessions. On at least five occasions, the interrogations were videotaped.

On March 14, 1988, Wang stated that Leung was not present during the heroin transaction in question. PRC officials were not satisfied with this response because they wanted him to implicate Leung in the heroin transaction so that there would be no misunderstanding that the heroin came from Hong Kong rather than mainland China. The officials reminded him of the Communist Party policy that if he cooperated, he would receive leniency; if he did not, he would be treated severely. They also told him that if he did not cooperate, he would be shot. Five days later, Wang confessed that Leung was not only present, but that he participated in the breakdown of the heroin bricks into powder form.

When United States prosecutorial officials learned of Wang's confession, they sought to bring him to the United States to testify against Leung. Members of the prosecution team were aware of human rights abuses occurring in the PRC and suspected that Wang might have been tortured when he gave his confession. Evidence strongly suggests that the lead prosecutor knew that a video of Wang's interrogation existed and that Hong Kong officials refused to prosecute Leung because they suspected that Wang's confession had been coerced and was untrue. Nonetheless, the prosecution ignored this evidence, failed to disclose any of it to defense counsel, and arranged for Wang to testify to Leung's involvement in the heroin transaction.

During the negotiations over bringing Wang to the United States, the prosecution team misrepresented to PRC officials that Wang's involvement would be a no-lose situa-

tion. The prosecution team failed to advise PRC officials about the requirements of the oath, the rigors of cross-examination in an American courtroom, and the possibility that Wang might seek asylum.

In order to expedite the use of Wang as a witness, the prosecution team requested that the PRC delay Wang's transfer to the jurisdiction of the Chinese courts. Had Wang appeared before the Chinese courts, he probably would not have come to the United States and instead would almost certainly have received lenient treatment because of his cooperation with PRC officials. Unfortunately for Wang, the PRC honored the American request.

The federal government paroled Wang into the United States as a witness for the prosecution on December 27, 1989. Five PRC officials accompanied him. Trial began on January 8, 1990. On January 30, Wang made a "personal request" while on the stand, and after a consultation in chambers, the district court judge appointed counsel to represent Wang. Wang's testimony on February 1 and 5 placed Leung at the scene of the heroin delivery. On February 5, Wang filed suit in district court seeking declaratory and injunctive relief, and submitted to the Immigration and Naturalization Service ("INS") a petition for asylum.[1] On February 10, the district court entered a preliminary injunction barring the government from returning Wang to Chinese custody pending his exhaustion of asylum proceedings. On February 13 and 14, Wang testified to the mistreatment he had endured and disavowed his earlier testimony, stating that Leung was not present during the heroin transaction.

On July 29, 1991, the INS District Director denied Wang's asylum request, and on February 18, 1992, it revoked his parole and placed him in exclusion proceedings. The

same day, Wang moved for a hearing on his earlier motion for partial summary judgment on his eleventh cause of action, which alleged that the government is "without legal authority over [Wang's] person and may not remove him from the United States or return him to Chinese custody."

Two days later, the district court granted Wang a preliminary injunction on the eleventh cause of action, prohibiting the government from moving forward with exclusion or deportation proceedings under the Immigration and Nationality Act ("INA") pending final adjudication of the motion for partial summary judgment. Four months later, it issued a permanent injunction forbidding the government from placing Wang in exclusion proceedings or taking any further action that could place him in jeopardy of being returned to China. The government appealed both injunctions and the grant of partial summary judgment, alleging that the district court lacked jurisdiction to enjoin exclusion proceedings and that it erred in concluding that the INS lacked jurisdiction to place Wang in exclusion proceedings.

The appeals were consolidated, and on October 30, 1992, we reversed, vacated both injunctions, and instructed the district court to dismiss the eleventh cause of action for lack of jurisdiction. *Xiao v. Barr*, 979 F.2d 151 (9th Cir.1992) ("*Wang I* ").[2] On March 2, 1993, the district court dismissed the cause of action as instructed. *Xiao v. Reno*, 837 F.Supp. 1500 (N.D.Cal.1993).

In April, 1993, the district court conducted a lengthy bench trial on the remaining causes of action and found that the government had committed flagrant violations of Wang's due process rights and breached its duty to protect its witnesses. *Wang II*, 837 F.Supp. at 1506.[3] On October 6, 1993, the court perma-

---

1. On July 5, 1990, Wang filed an amended complaint, which is the operative pleading before the court.

2. The Chinese list their surname first. Thus, the surname of Wang Zong Xiao is Wang, not Xiao. Just as we would abbreviate "Bob Smith v. Barr" as "Smith v. Barr" rather than "Bob v. Barr," we should abbreviate case names using the Chinese person's surname, not given name.

We hope that future cases will be abbreviated appropriately.

3. The court found in favor of the government on the following of Wang's causes of action: injunctive relief pending final adjudication of asylum application, including federal judicial review (first and second causes of action), breach of the government's duty to exercise ordinary care (fifth), equitable estoppel based on affirmative governmental misconduct (sixth), violation of 18

nently enjoined the government from "taking any action in furtherance of removing Wang from the jurisdiction of the United States or of returning him to the custody of the PRC or any of its representatives." *Id.* at 1564. The government appeals.

## STANDARD OF REVIEW

■ We review questions of subject matter jurisdiction *de novo.* *Nike, Inc. v. Comercial Iberica de Exclusivas,* 20 F.3d 987, 990 (9th Cir.1994). The district court's factual findings on all jurisdictional issues must be accepted unless clearly erroneous. *Id.*

## DISCUSSION

The virtually unchallenged findings of the district court reveal a course of governmental misconduct in which United States officials and prosecutors callously violated Wang's Fifth Amendment due process rights.[4] The district court found that the government's actions forced Wang to make a Hobson's choice:[5]

> whether to abide by his oath in the American court to tell the truth on the witness stand, and thereby face near certain execution in the PRC, or to lie under oath in the American court and receive leniency in the PRC. The ... actions of the United States government ... individually and collectively shock the conscience of the Court and deprive Wang of the substantive due process to which he is entitled.[6]

837 F.Supp. at 1559. To remedy the due process violations and to protect Wang from future torture, the court entered a permanent injunction barring the United States from removing Wang or returning him to China. The court exercised jurisdiction over Wang's due process claim pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and to its inherent supervisory power to remedy extraordinary governmental misconduct. We affirm.

## I. Jurisdiction and Exhaustion

Under 28 U.S.C. § 1331, federal courts have jurisdiction over constitutional claims. That statute states that the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Wang's due process claim arises under the United States Constitution. The central jurisdictional dispute is whether Wang must first exhaust his administrative remedies under the INA and receive a final agency determination that he be returned to China before the district court can exercise its jurisdiction over his due process claim.

### A.

■ The government argues that "the existence of possible constitutional claims furnishes no basis for excusing plaintiff's failure to exhaust his remedies." The government contends that § 1105a(c) of the INA provides the sole avenue for judicial review in the instant case and that such review can occur only at the habeas corpus proceeding after Wang exhausts his administrative remedies.

U.S.C. § 3508 (seventh), violation of procedural due process, alleging that § 3508 is unconstitutional as applied to Wang (eighth), violation of procedural due process, alleging that § 3508 is unconstitutional as applied to any prisoner from China (ninth), violation of 8 U.S.C. § 1182 (tenth), and violation of the law of nations and international law (twelfth).

4. The only factual finding the government appears to challenge is the district court's finding that members of the Department of State and the INS engaged in officious intermeddling in Wang's asylum application before the proceedings commenced. Our decision does not rest on those findings.

5. The phrase "Hobson's choice" is often used incorrectly. The phrase comes from Thomas Hobson, an English liveryman who required every customer to choose the horse nearest the door. *Webster's Ninth New Collegiate Dictionary* 574 (1985). A Hobson's choice is thus an apparently free choice when there is no real alternative. *Id.* Here, however, Wang technically was not confronted with a Hobson's choice—rather, Wang was forced to choose between two harmful options.

6. Wang's predicament is actually far graver than it first appears because lying under oath in federal court is a federal crime in the United States punishable by $2,000 and/or 5 years imprisonment. 18 U.S.C. § 1621.

**814**

Section 1105a(c) of the INA provides, in relevant part:

> An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations....

8 U.S.C. § 1105a(c). The government argues that § 1105a(c) forecloses judicial review of all of Wang's claims, constitutional and otherwise, until the conclusion of INS exclusion proceedings.

■ "Of 'paramount importance' to any exhaustion inquiry is congressional intent. Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). When exercising our discretion, we must apply exhaustion principles "in a manner consistent with congressional intent and any applicable statutory scheme." *Id.* Here, where Congress has not specifically mandated exhaustion, we conclude that consistent with congressional intent and the INA, the district court properly exercised jurisdiction over Wang's due process claim even though he had not exhausted

administrative remedies with respect to his excludability.

The government's argument that the INA requires exhaustion in this case is meritless because Wang's due process claim does not implicate the INA at all. This is no longer a case where an alien is petitioning for asylum under the INA or challenging exclusion proceedings. In the record before us, the government was found to have recklessly brought Wang into this country, "place[d] him on the witness stand, and compel[led] him to make an unconscionable choice between telling the truth and saving his own life." *Wang II*, 837 F.Supp. at 1548. Wang's claim, a violation of the Fifth Amendment as opposed to a statutory entitlement to asylum, falls outside the INA's scope.[7] Thus, because Wang's action does not implicate the INA, let alone involve review of an order of deportation or exclusion, we conclude that he was not statutorily required to exhaust his administrative remedies prior to seeking judicial relief for the violation of his due process rights.[8]

Requiring exhaustion here would not serve "the twin purposes of protecting administrative agency authority and promoting judicial efficiency," *see McCarthy*, 503 U.S. at 144–47, 112 S.Ct. at 1086–87; *Weinberger v. Salfi*,

7. Under the INA, the Board of Immigration Appeals ("BIA") reviews the immigration judge's ("IJ") decision and has the authority to enter a final order of exclusion. *See* 8 C.F.R. § 236.7. The BIA, however, does not have jurisdiction to adjudicate constitutional issues. *See, e.g., Bagues–Valles v. INS*, 779 F.2d 483, 484 (9th Cir. 1985) (petitioners not precluded from raising due process claim even though not raised during administrative proceedings because BIA has no jurisdiction to adjudicate constitutional issues). In the instant case, the IJ held that Wang's claims of government misconduct and constitutional violations were not cognizable in his exclusion proceedings. *In re Wang Zong Xiao*, No. 29–621–675 at 13 (INS, June 8, 1993).

In some instances, an administrative court can hear a constitutional claim because it involves a procedural error that is correctable by the administrative tribunal. *Vargas v. INS*, 831 F.2d 906, 908 (9th Cir.1987); *Dhangu v. INS*, 812 F.2d 455, 460 (9th Cir.1987); *Bagues–Valles*, 779 F.2d at 484. This case falls outside the exception articulated in those cases because Wang's claim does not involve a procedural error correctable by an immigration judge or the Board of Immigration Appeals. He claims no error arising in the course of immigration proceedings.

8. The government does not deny that the district court had the equitable power to fashion a permanent injunction in this case. Rather, it contends that the court erred in concluding it could exercise its equitable power. We disagree.

We have previously held that

the key consideration is not whether a complete statutory remedy exists for the constitutional violation charged. Rather, "when the *design* of a government program suggests that Congress has provided mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies."

*Saul v. United States*, 928 F.2d 829, 837 (9th Cir.1991) (emphasis in original) (citing *Schweiker v. Chilicky*, 487 U.S. 412, 423, 108 S.Ct. 2460, 2467, 101 L.Ed.2d 370 (1988)). Here, the design of the INA does not suggest that Congress considered and provided mechanisms to remedy the constitutional violations alleged by Wang. Congress could not have intended for the INA to redress constitutional violations when neither the IJ nor the BIA has jurisdiction to hear such claims.

422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975). Wang's constitutional claim does not implicate the INA, and could not possibly involve review of the INS's exercise of its discretionary power. Accordingly, by adjudicating Wang's constitutional claim, over which the INS lacked jurisdiction, the court neither forfeited the benefit of INS expertise,[9] nor deprived the INS of the opportunity to correct its own mistakes, nor weakened the effectiveness of the INS by encouraging disregard of its procedures. *See McCarthy*, 503 U.S. at 144, 112 S.Ct. at 1086. Furthermore, requiring exhaustion would neither moot the judicial controversy nor produce a useful record[10] for subsequent judicial consideration. *See id.* at 144–47, 112 S.Ct. at 1086–87. There is little, if any, possibility of duplicative effort by agency and court.

Not only do the institutional interests militate against requiring administrative exhaustion, but Wang's interests also weigh heavily against it. *See McCarthy*, at 145–49, 112 S.Ct. at 1087–88 (describing three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion). In *McCarthy*, the Supreme Court stated,

> an administrative remedy may be inadequate "because of some doubt as to whether the agency was empowered to grant effective relief." For example, an agency, as a preliminary matter, may be unable to consider whether to grant relief because it lacks institutional competence to resolve the particular type of issue presented.... Alternatively, an agency may be competent to adjudicate the issue presented, but still lack authority to grant the type of relief requested.

*Id.* at 147–48, 112 S.Ct. at 1088 (citations omitted). Here, the INS is not empowered to grant effective relief for the governmental misconduct at issue in this case: it lacks institutional competence to resolve the constitutional issue presented; moreover, even if it were capable of adjudicating the issue, it would lack the authority to grant the type of relief requested.[11]

Because the inability of the INS to adjudicate the constitutional claim completely un-

---

9. *See Shelter Framing Corp. v. Pension Benefit Guar. Corp.*, 705 F.2d 1502, 1509 (9th Cir.1983) (concluding that "[t]he Guaranty Corporation's expertise relates only to how the Amendments Act is to be applied and administered; it cannot aid the court in addressing the naked constitutional law issue raised by the employers ...").

10. In this case, the IJ and BIA would have excluded any evidence of the substantive due process violations as irrelevant because they have no jurisdiction to hear constitutional claims. Moreover, under the INA, the alien has no right to discovery. *See In re Magana*, 17 I & N Dec. 111, 115 (BIA 1979). Discovery was critical to Wang's efforts to expose the government's misconduct. Had the government prevailed on its jurisdictional claim below, a grave injustice would have occurred because INA procedure and the government's litigation strategy would have prevented Wang from uncovering the government's serious misconduct. Although it is true that the INA allows for eventual district court review in a habeas corpus proceeding, such review is confined to the record created by the IJ and BIA. *See Kessler v. Strecker*, 307 U.S. 22, 34, 59 S.Ct. 694, 700, 83 L.Ed. 1082 (1939). The government itself argued before the district court that "[a]lthough denominated 'habeas corpus proceedings,' a district court's review of a final order of exclusion is a record review, with no new evidence taken." Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss Plaintiff's First Amended Complaint at 5 n. 1, *Xiao*, 837 F.Supp. 1500.

11. Wang has sought a permanent injunction prohibiting his return to China. The INS could not grant him that relief; it could only grant him asylum. Although a grant of asylum might overlap to some degree with the relief he has sought, it may be revoked. *See* 8 U.S.C. § 1158(b); 8 C.F.R. § 208.24. The standard for revocation of asylum is a preponderance of the evidence. *See* 8 C.F.R. 208.24(a). By contrast, a motion to modify or vacate a permanent injunction is judged by a stricter standard. *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 365 (9th Cir.1990) (requiring movant to show "clearly a substantial change in circumstances or law since the orders were entered, extreme and unexpected hardship in compliance with the injunctions' terms, and a good reason why [the court] should modify the permanent injunctions...."); *see also 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure*, § 2961, at 402–03 (1995) ("The three traditional reasons for ordering the modification or vacation of an injunction are (1) changes in operative facts, (2) changes in the relevant decisional law, and (3) changes in any applicable statutory law."). Accordingly, a grant of asylum would not fully vindicate Wang's constitutional rights.

dermines most, if not all, of the purposes underlying exhaustion, we conclude that Wang was not required to exhaust his administrative remedies concerning excludability as a prerequisite to filing his due process claim. This result is compelled because the constitutional question is clear and is unrelated to his claim for asylum, *see Andrade v. Lauer,* 729 F.2d 1475, 1493 (D.C.Cir.1984); an administrative proceeding would not turn on the constitutional issue much less eliminate every remnant of it. *See Public Util. Comm'n of Cal. v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 450–51, 2 L.Ed.2d 470 (1958).

### B.

■ The government also contends that *Wang I* controls this case. In *Wang I,* the district court exercised jurisdiction over Wang's eleventh cause of action. The eleventh cause of action stated that the government is "without legal authority over [Wang's] person and may not remove [him] from the United States or return [him] to Chinese custody." 979 F.2d at 153. The district court based its exercise of jurisdiction over the eleventh cause of action "on its belief that exhaustion was not required since Wang was not appealing an order of exclusion, but rather contesting the INS' authority to place him into exclusion proceedings." *Id.* at 153. We reversed, stating that "judicial review is precluded if the alien has failed to avail himself of all administrative remedies, one of which is the exclusion hearing itself." *Id.* The government argues that this language similarly precludes jurisdiction over Wang's due process claims.

The government misreads *Wang I.* In *Wang I,* we narrowly framed the issue on appeal as "whether the question of the INS' jurisdiction is appropriately decided in the first instance by the INS, or whether it is an issue beyond the authority of the INS to resolve and remedy." *Id.* We held that "the INS should be accorded the opportunity to determine its own jurisdiction." *Id.* We were silent as to the other claims alleged in Wang's complaint, including his due process claim.

Here, Wang does not challenge the exclusion proceedings, but asks the district court to remedy a due process violation. Wang is seeking relief from violations of his constitutional rights due to extraordinary governmental misconduct. This claim is wholly independent of any assertable under the INA. Indeed, in *Wang I,* we noted that Wang's eleventh cause of action is "not constitutionally based, but rather turns on a question of statutory interpretation...." *Id.* at 155. In contrast to Wang's eleventh cause of action, Wang's due process violation is constitutionally based.[12] Accordingly, the district court properly exercised jurisdiction over his due process claim.

### II. Wang's Fifth Amendment Rights

■ Wang may invoke the right to due process guaranteed by the Fifth Amendment. Contrary to the government's assertions, *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), does not control this case. In *Verdugo–Urquidez,* the Court held that the Fourth Amendment does not apply to the search and seizure by United States agents of property

---

**12.** Because Wang's claim is based on the Constitution, the government's reliance on *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), is misplaced. Unlike Wang's claim, the claims asserted by the plaintiffs in *Heckler* arose out of the statutory scheme. *Id.* at 615, 104 S.Ct. at 2021. In *Heckler,* the plaintiffs contested the Secretary of Health and Human Service's denial of Medicaid reimbursement for a particular type of surgery. They filed suit in federal court to contest the Secretary's rule that the surgery was not reasonable and necessary, and the procedure by which the Secretary reached this rule. The Supreme Court determined that plaintiffs' challenge to the rule was in essence a claim for benefits, and that their chal-

lenge to the procedure was inextricably intertwined with their benefits claim. *Id.* at 614, 104 S.Ct. at 2021. Therefore, the plaintiffs were required to exhaust administrative remedies before going to federal court. *Id.* at 619, 104 S.Ct. at 2024.

*Heckler* is inapposite because it did not involve federal constitutional claims that are collateral to the administrative proceedings. In this case, Wang's claims of prosecutorial and other governmental misconduct are independent of any claims assertable under the INA. The only claim which could be construed to implicate the INA process was the eleventh cause of action, and that was properly dismissed by this court in *Wang I.*

owned by a Mexican citizen and located in his Mexican residence. The Court observed that the Fourth Amendment,[13] "by contrast with the Fifth and Sixth Amendments, extends its reach only to 'the people.'" 494 U.S. at 265, 110 S.Ct. at 1060. The Court noted that "'the people' seems to have been a term of art employed in select parts of the Constitution" that refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* Thus, the Court reasoned, the purpose of the Fourth Amendment was to "protect the people of the United States against arbitrary action by their own Government," and not "to restrain the actions of the Federal Government against aliens outside of the United States territory." *Id.* at 266, 110 S.Ct. at 1061.[14]

However, as the *Verdugo–Urquidez* Court expressly noted, the Fifth Amendment provides protection to the "person" rather than "the people." [15]. *Id.* at 265–66, 110 S.Ct. at 1060–61. In *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982), the Supreme Court stated, "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term," and is therefore a "'person[]' guaranteed due process of law by the Fifth and Fourteenth Amendments." This principle clearly applies to Wang, who became an alien in this country through the purposeful actions of the United States government. *See Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) ("The Fifth Amendment ... protects every [alien within the jurisdiction of the United States] from deprivation of life, liberty, or property without due process of law .... [e]ven one whose presence in this country is unlawful, involuntary, or transitory ...").

Moreover, unlike *Verdugo–Urquidez,* this case does not concern an isolated, extraterritorial violation of the Constitution. *See Verdugo–Urquidez,* 494 U.S. at 264, 110 S.Ct. at 1060 ("For purposes of this case, therefore, if there were a constitutional violation, it occurred solely in Mexico."). Rather, the two-year American prosecutorial effort violated Wang's due process rights on American soil, where he was forced in an American courtroom, to choose between committing the crime of perjury or telling the truth and facing torture and possible execution.[16]

**13.** The Fourth Amendment provides:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...

**14.** We note, however, as did Judge Wallace in his dissent in *Verdugo–Urquidez,* that although the Fourth Amendment does not apply to a search on foreign soil of a foreign national's property, an alien may invoke the Fifth Amendment to challenge the admission of evidence obtained in a foreign country through means that "shock the conscience." *United States v. Verdugo–Urquidez,* 856 F.2d 1214, 1245 (9th Cir.1988) (Wallace, J., dissenting), *rev'd,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). We have suggested that, in the exercise of its supervisory powers, a district court could refuse to allow prosecutors to enjoy the fruits of extraterritorial conduct that shocked the conscience. *See Stonehill v. United States,* 405 F.2d 738, 745 (9th Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *see also United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 64–66 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (explaining that in *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), where the particular circumstances of the abduction of an Italian citizen constituted cruel, inhuman, and outrageous treatment that shocked the con-

science, and there was no fruit of the abduction that could be suppressed other than the conviction, the sole effective remedy was to order the petitioner's release).

**15.** The Fifth Amendment provides:
> [N]or shall any *person* be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law....

U.S. Const. Amend. V (emphasis added).

**16.** The government's argument that Wang had no right to due process while he was in China, when many of the actions to bring him to the United States were taken, is wide of the mark. The deprivation itself occurred on American soil when Wang was forced to take the witness stand, and on that basis alone, we find that he may claim a violation of his due process rights. Moreover, as the district court properly noted, many of the actions occurring while Wang was in China, were taken in the United States, unlike the search in *Verdugo–Urquidez,* and, more important, all of them contributed to the creation of "the dilemma Wang faced when he took the witness stand in January 1990." *Wang II,* 837 F.Supp. at 1548. Thus, to accept the govern-

Thus, we conclude that Wang is guaranteed due process under the Fifth Amendment.

## A.

█ The government does not challenge on appeal the district court's conclusion that it acted with gross negligence and deliberate indifference, or that its actions shock the conscience of the court. Rather, the government argues that Wang's due process rights were not violated because the government "has no constitutional duty to protect a witness from harm stemming from his or her testimony that may occur after the witness is released from the government's custody."

The government's argument fails to take into account the government's constitutional duty to protect a person when it creates a special relationship with that person, or when it affirmatively places that person in danger. *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir. 1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). Here, the government did both. The government created a special relationship with Wang by paroling him into the United States and placing him in custody. *See, e.g., DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Court held that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes some responsibility for his safety and general well-being." [17] In so holding, the Court explained that when the government creates a special relationship with a person by placing him in a vulnerable situation, the substantive component of the Due Process Clause obligates the government to provide for that person's basic needs and to protect him from deprivations of liberty. *Id.* at 199–200, 109 S.Ct. at 1005. Having placed Wang in custody, the government had an obligation to protect him from liberty deprivations he faced by virtue of his testimony in court.

In *Wood v. Ostrander,* 879 F.2d 583, 588 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), we applied *Deshaney's* principles to a case in which the government placed a person in danger. We reversed the district court's grant of summary judgment, holding that the plaintiff had raised a triable issue of fact as to whether the government violated her due process rights when it affirmatively placed her in danger. In *Wood,* a state trooper had allegedly left Linda Wood stranded near a military reservation that had the highest aggravated crime rate in the county outside the City of Tacoma, Washington. *Id.* at 586. The trooper had allegedly stopped the car in which Wood was a passenger and placed the driver under arrest for driving while intoxicated. *Id.* He had allegedly impounded the car and left Wood stranded on a highway at 2:30 a.m., five miles from her home and wearing only jeans and a blouse in fifty degree weather. *Id.* After attempting to walk home, Wood had allegedly accepted a ride from a man who took her to a secluded area and raped her. *Id.* We held that the government's alleged misconduct-stranding Wood in a high crime area-triggered the duty to afford Wood some measure of peace and safety, and that Wood raised a triable issue of fact as to whether the government affirmatively placed her in a position of danger. *Wood,* 879 F.2d at 590.

Here, the government affirmatively placed Wang in danger by requesting that China delay his transfer to the jurisdiction of the Chinese courts (thereby depriving him of leniency), failing to inform Chinese officials that defense counsel would hammer away at the voluntariness of his confession, failing to uphold its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose to defense counsel that the confession was coerced, subjecting Wang to an oath that required him to tell the truth,

---

ment's argument would artificially place beyond our "purview *any* actions taken prior to the time Wang arrived in the United States," *id.,* even those actions that led directly to, and are inextricably intertwined with, the ultimate violation of his due process rights. We refuse to draw such an artificial line.

17. We find it particularly troublesome that while Wang was in the custody of the United States and on United States soil, the government still allowed Wang to be coerced by the Chinese authorities accompanying him. *See Wang II,* 837 F.Supp. at 1536–37.

and putting him in a situation where he had to choose between perjuring himself in federal court (a crime under 18 U.S.C. § 1621) and telling the truth and thereby losing the possibility of lenient treatment from the Chinese courts. As a result, the government placed Wang in danger of violating his own conscience and the federal perjury statute, or of facing torture and possible execution in China.

Unlike *DeShaney,* in which the victim was "in no worse a position than that in which he would have been had [the government] not acted at all," 489 U.S. at 201, 109 S.Ct. at 1006, Wang is in a far worse position because of the government's reckless actions. Had the government not interfered with Wang's transfer to the jurisdiction of the Chinese Courts, not paroled him into this country, and not subjected him to a life or death choice, Wang would have earned leniency in China and would have been able to stay in his homeland.

The district court also held that the government's conduct was so egregious that it shocked the conscience and for that reason as well, violated due process principles. *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). We need not address this issue, for Wang has proven facts sufficient to establish a violation of his liberty interest in personal security and thus of his due process rights secured by the Fifth Amendment. *See Wood,* 879 F.2d at 591 n. 8.

**B.**

■ The government argues that Wang lacks standing because he has not yet been returned to China and therefore has not yet suffered harm from the alleged due process violations. Contrary to the government's assertion, however, harm to Wang occurred as soon as he told the truth (as required by the oath), because at that point he lost his opportunity to return to China without facing torture and possible execution. As the district court found:

> [t]he situation Wang faces if he is returned to the PRC today is vastly different from the one he would have faced had he not been brought to the United States to testi-

fy at the Goldfish trial. The situation Wang would have faced can best be understood by referring to the eight-character Chinese phrase that appeared on the wall of Wang's interrogation rooms: leniency to those who cooperate, harshness to those who resist. Wang had cooperated with the PRC police authorities, and he, therefore, would have been treated with leniency. Today, Wang faces the harshest possible treatment in the event he is returned to the PRC.

837 F.Supp. at 1541.

Moreover, the harm here is sufficiently "real and immediate to show an existing controversy." *Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982). Indeed, the government's actions to date, including the INS' current determination that Wang is excludable, suggests that the government is actively trying to send Wang back to China.

**C.**

The government tells us that "the Attorney General has determined ... she will not return Wang unless the United States Government is confident that he will not be executed because of his conduct in judicial proceedings in the United States." The Attorney General's determination does not affect our decision for two reasons. First, the United States government cannot guarantee that China, a sovereign nation, will not execute Wang for his decision to testify truthfully. New officials may come into power in China or the Chinese government may simply change its mind about whether or not to execute him. Indeed, the district court found at trial that a request for leniency made by the American government "likely will have no effect whatsoever on the Chinese government." 837 F.Supp. at 1544.

Second, even if Wang is not executed, he will still face harsh treatment if returned to China. The district court found that Wang's actions, which have violated the Chinese Constitution and the Criminal Law of China, have rendered him a "counterrevolutionary" in the eyes of the Chinese criminal justice system. 837 F.Supp. at 1542. Professor

James Feinerman, the government's own expert witness, expects that China will single out Wang for mistreatment upon his return:

> [i]t could involve everything from very severe beatings, kicking, things that could be quite harmful to his person, to the more subtle or psychological forms of harassment and intimidation. . . .

*Id.* at 1543. We find it deplorable that the government, which has placed Wang in his present predicament, is not only not protecting him, but rather is actively trying to return him to a place where he will likely be tortured.

### III. The District Court's Supervisory Power to Protect Witnesses and to Maintain the Integrity of the Judicial System

The district court's exercise of jurisdiction over Wang's constitutional claim is also independently rooted in its inherent supervisory power to protect government witnesses. The district court's powers to protect a witness appearing before it is justified on the grounds that it promotes "the more general purpose of protecting the administration of justice from 'abuses, oppression and injustice.'" *Wheeler v. United States,* 640 F.2d 1116, 1123 (9th Cir.1981) (quoting *Bitter v. United States,* 389 U.S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967)).

In *Wang I,* which was decided before the district court's bench trial, we found that the court's inherent supervisory powers did not provide an independent basis of jurisdiction in derogation of 8 U.S.C. § 1105a(c)'s exhaustion requirement. *Wang I,* 979 F.2d at 155. The government relies upon the twin statements in *Wang I* that "it is within the province of the Immigration Judge and the Board of Immigration Appeals to consider the need to protect Wang, and either to grant him asylum or stay his deportation," and that "[t]he habeas corpus proceedings, to which Wang is statutorily entitled at the conclusion of exclusion proceedings, are adequate to afford the district court an opportunity to protect him, as a former witness, from 'abuses, oppression, and injustice.'" *Id.* (citation omitted). As we have seen, however, *Wang I* concerned only Wang's rights under the INA; it did not involve his Fifth Amendment due process rights. We could have referred in *Wang I* only to the oppressive fate that may have awaited Wang on his return to China after exclusion proceedings, not to the conduct of our own government that was the focus of the constitutional claims. Accordingly, the statements relied upon by the government were premised, at least in part, on the statutory requirement of exhaustion that does not apply to the constitutional claims. *See Wang I,* 979 F.2d at 156 (stating that "[g]iven the statutory mandate requiring exhaustion ... the district court should have accorded the executive proceedings due respect, and consequently should have refrained from exercising jurisdiction").

More importantly, the largely uncontested post-remand findings on the extraordinary nature of the government's misconduct in securing Wang as a prosecution witness, which were not before us in *Wang I,* counsel in favor of an exercise of supervisory power. The government's conduct significantly interfered with the administration of justice. *See Wheeler,* 640 F.2d at 1124. In its efforts to secure testimony that would lead to the conviction of an international drug smuggler, the government engaged in conduct that deprived its key witness of his right to due process, including:

> outrageous lies to the [district court] concerning evidence pivotal to Wang's testimony; the deliberate concealment [from defense counsel of the memorandum from Hong Kong officials detailing their reasons for refusing to prosecute Leung]; the false promise that the government would make a good-faith effort to obtain interrogation documents from the PRC; the deliberate lie that the government prosecutor made denying that he had ever heard of any video being taken of Wang; the policy of willful ignorance towards all evidence tending to show that 'unconventional' interrogation tactics had prompted a switch in Wang's story; the request to delay Wang's transfer to the jurisdiction of the Chinese courts, thereby depriving Wang of the possibility of leniency before the Chinese courts. . . .

*Wang II,* 837 F.Supp. at 1559.

The government brought Wang to the U.S. in reckless disregard of the real possibility

that his inculpatory testimony was false and that, if he told the truth, he would face torture and possible execution upon his return to the PRC. *See Demjanjuk v. Petrovsky*, 10 F.3d 338, 355 (6th Cir.1993), *cert. denied*, — U.S. —, 115 S.Ct. 295, 130 L.Ed.2d 205 (1994) (prosecuting attorneys engaged in prosecutorial misconduct when they recklessly disregarded their obligation to provide information specifically requested by detainee, thereby endangering detainee's defense). *See also United States v. Kojayan*, 8 F.3d 1315, 1324 (9th Cir.1993) ("It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win.") (citing instances of prosecutorial misconduct). In so doing, the government failed in its duty to "win fairly, staying well within the rules" and, more importantly, to "serve truth and justice first." *Kojayan*, 8 F.3d at 1323. The district court found that the government, in this case, strayed from its responsibility "to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Id.* Thus,

> [i]n a situation like this, the judiciary—especially the court before which the primary misbehavior took place—may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events.

*Kojayan*, 8 F.3d at 1325. The district court properly recognized and applied these principles to the government's mistreatment of Wang.

AFFIRMED.